UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TSI USA LLC,

            Plaintiff,

    v.

UBER TECHNOLOGIES, INC.,

            Defendant.

Case No. 17-cv-03536-HSG

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. No. 127

Pending before the Court is Defendant Uber Technologies, Inc.'s motion for partial summary judgment. Dkt. No. 127. The Court held a hearing on the motion on August 27, 2020. Dkt. No. 149. For the reasons detailed below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.

I.    **BACKGROUND**

    A.    **Factual Background[1]**

Plaintiff TSI USA LLC and Defendant entered into a Services Agreement and "Statement of Work for Uber Global Travel Management Services" ("SOW"), effective November 24, 2014 (collectively, the "Agreements"). *See* Dkt. No. 89-1, Exs. 1–2. The SOW detailed the scope of the Services that Plaintiff would provide, including global travel management services for Uber employees. *See id.* The SOW included a checklist that outlined the services that plaintiff offered "within the scope" of the Agreements. *See id.*, Ex. 2 at Ex. B. Such services included providing specific technology and support services for booking and managing travel plans. *See id.* Defendant could also "issue additional instructions, require additional Services or reduce or waive

---

[1] Except where noted otherwise, relevant facts are undisputed.

United States District Court  
Northern District of California

Services covered by the applicable SOW" at any time, if done in writing and with a mutually agreed upon adjustment in price and time of performance. *See id.*, Ex. 1 at ¶ 2.2. Under the Agreements, Defendant agreed to pay Plaintiff a "flat management fee" based on the monthly volume of airline, rail, hotel and car sales booked through Plaintiff or fulfilled through Plaintiff's online booking tool on Defendant's behalf. *See id.*, Ex. 2 at Ex. C ("Payment Terms" and "Flat Management Fee"). If, for example, Defendant booked between $833,333 and $1.25 million in a given month, it would pay Plaintiff a 3% management fee. *See id.* The "baseline minimum" in combined sales booked through Plaintiff under the Agreements, over the course of the two-year term, was $10 million. *See id.* ("Contracted Baselines" and "Term"). The Agreements further explained that the "[t]argeted 'go live' date" was January 2, 2015. *See id.*, Ex. 1 at ¶ 10.1; *id.*, Ex. 2 ("Schedule").

The program did not launch by this "go live" target. *See* Dkt. No. 129-4, Ex. D (Brady Depo.) at 109:4–112:21. According to Defendant, Plaintiff demonstrated the travel system internally, but it had several problems and Defendant was concerned that it could not adequately test the technology prior to the anticipated launch. *See id.*; *see also id.*, Ex. 22 at TSI_113007; *id.*, Ex. 23 at TSI_116100. Defendant also stated that Plaintiff was unable to place the software app in Apple's App Store by January 2, 2015, a prerequisite to launching the program. *See id.* at 107:5–108:21, 111:22–112:21; *see also id.*, Ex. 23 at TSI_116100. Therefore, Defendant explained, the launch was delayed and instead converted into a small "pilot" launch to test the program for approximately two weeks. *See* Brady Depo. at 109:4–112:8, 113:17–114:11; *id.*, Ex. 25 at TSI_113980.

Plaintiff sent Defendant an invoice dated August 25, 2015, for $200,000, which purportedly covered management fees from January through August 2015. *See* Dkt. No. 49-2, Ex. J. Defendant states that during this period, Plaintiff made only 129 travel related bookings for Defendant, which totaled $353,534. *See* Dkt. No. 129-5, Ex. E (Resp. to Rog. No. 13) at TSI_132238; *see also* Dkt. No. 129-6, Ex. F (Plaintiff's Initial Discl.). Defendant decided to terminate the Agreements. *See* Dkt. No. 128 (Jaffe Decl.) at ¶¶ 17–18. By letter dated August 28, 2015, Defendant provided Plaintiff with notice of termination. *See id.* at ¶ 18. The termination

1    notice stated:

2    <blockquote>Enclosed please find a check payable to TSI USA, LLC in the amount
3    of $201,226.30.  By executing below, you acknowledge and agree that
     such payment constitutes full and final payment of all outstanding
     payment obligations under the Agreement, and that no further
4    amounts are or shall become due.

5    You hereby release and discharge us and our affiliates . . . from all
     actions, causes of action, claims, damages, suits, and demands of any
6    kind whatsoever, in law or equity . . . relating to or arising out of the
     Agreement.</blockquote>

7

8    *See* Dkt. No. 43, Ex. A; *see also* Dkt. No. 49-1 (Groenewald Decl.) at ¶ 15.  Defendant contends

9    that it did not owe Plaintiff anything for its unsatisfactory services, but the check, which was

10   enclosed with the termination notice, was intended to cover:  (1) the $200,000 that Plaintiff

11   requested for its services from January through August 2015; as well as (2) $1,226.30 to reimburse

12   Plaintiff for the cost of an airline ticket that Plaintiff had advanced on Defendant's behalf in June

13   2015.  *See* Jaffe Decl. at ¶¶ 17–18; *see also* Groenewald Decl. at ¶ 15; Dkt. No. 89 at ¶ 48(d).

14          Plaintiff cashed the check.  *See* Jaffe Decl. at ¶ 18.  It subsequently sent Defendant an

15   additional statement to recover $1.4 million in purported costs incurred and owed by Defendant.

16   *See* Dkt. No. 129-1, Ex. A (Kumpf Depo.) at Ex. 4-A.  The invoiced included:  (1) $791,580.25 in

17   "Implementation Costs" from November 2014 through August 2015; (2) $101,450.00 for

18   "Ginseng Project Costs" from April through July 2015; and (3) $739,843.50 in "Monthly Service

19   Costs" from January through November 2015.  *Id.*  The invoice also credited the $200,000 from

20   Defendant as a "partial payment."  *Id.*  Defendant contends that these costs are inflated, and in any

21   event, Plaintiff is not entitled to recoup them under the Agreements.  *See* Dkt. No. 127 at 10.

22          As relevant to the instant motion, the Agreements allowed Defendant "at its sole

23   discretion" to "terminate all or any part of this Agreement or SOW hereunder by providing

24   [Plaintiff] 90 days written notice."  *See* Dkt. No. 89-1, Ex. 1 at ¶ 11.1 ("termination provision").

25   The termination provision further states that "Uber will provide 90 days written notice and

26   [Plaintiff] shall be entitled to its costs already incurred in the performance of the Services."  *Id.*

27   The Agreements also contained a limitation of liability clause that states:

28

United States District Court
Northern District of California

3

1

2

3

4

5

> 9.2    LIMITS OF LIABILITY. . . . IN NO EVENT SHALL UBER'S TOTAL CUMULATIVE LIABILITY OF EACH AND EVERY KIND UNDER THIS AGREEMENT EXCEED THE TOTAL AMOUNT PAID TO [PLAINTIFF] FOR SERVICES PERFORMED IN ACCORDANCE WITH THE APPLICABLE SOW.   THE FOREGOING LIMITATION OF LIABILITY AND EXCLUSION OF CERTAIN DAMAGES SHALL APPLY REGARDLESS OF THE SUCCESS OR EFFECTIVENESS OF OTHER REMEDIES.

6    See id., Ex. 1 at ¶ 9.2  ("limitation of liability provision").  The meaning of the termination

7    provision and this limitation of liability underlie the parties' dispute in this action.

8         **B.    Procedural History**

9         Plaintiff filed its initial complaint on July 27, 2016, and an amended complaint on

10   September 16, 2016, both in the Northern District of Texas.  Dkt. Nos. 1, 7.  Plaintiff asserted

11   claims for breach of contract, unjust enrichment/quantum meruit, fraud, tortious interference with

12   contract, and defamation/business disparagement.  *See* Dkt. No. 7.  It also sought compensatory

13   and punitive damages, as well as attorneys' fees.  *Id.*  The case was subsequently transferred to the

14   Northern District of California on June 19, 2017.  *See* Dkt. No. 31.  On August 31, 2017,

15   Defendant filed a motion to dismiss.  Dkt. No. 42.  The Court granted the motion in part,

16   dismissing Plaintiff's fraud and tort claims and the prayer for punitive damages and attorneys'

17   fees.  *See* Dkt. No. 68.

18        Plaintiff filed a Second Amended Complaint ("SAC") on April 22, 2019.   Dkt. No. 89.

19   Defendant again moved to dismiss.  *See* Dkt. No. 90.  Plaintiff, however, failed to respond to the

20   motion.  The Court thus issued an order to show cause as to why the motion should not be granted.

21   *See* Dkt. No. 94.  Plaintiff responded that it did not oppose the motion and stated that the Court

22   should resolve the motion "as it deems appropriate."  Dkt. No. 95.  The Court granted the motion

23   and dismissed the fraud and defamation claims, as well as the prayers for punitive damages and

24   attorneys' fees, with prejudice.  *See* Dkt. No. 100.  Plaintiff's claims for breach of contract and

25   unjust enrichment/quantum meruit remain.  *See* SAC at ¶¶ 52–60.  Defendant answered the

26   remaining portions of the SAC and, *inter alia*, asserted an affirmative defense of fraud.  *See* Dkt.

27   No. 102 at 12–13.  Defendant contends that Plaintiff made false and/or misleading statements

28   about its size and the scale of its travel services to induce Defendant to contract with Plaintiff.  *See*

United States District Court
Northern District of California

4

1   *id.* Defendant urges that it would not have entered into the Agreements had it known the truth

2   about Plaintiff's size and abilities. *Id.* Defendant now moves for partial summary judgment. *See*

3   Dkt. No. 127.

4   **II.    LEGAL STANDARD**

5           Summary judgment is proper when a "movant shows that there is no genuine dispute as to

6   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

7   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

8   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence

9   in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.*

10  But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

11  the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

12  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

13  or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),

14  *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court

15  finds that there is no genuine dispute of material fact as to only a single claim or defense or as to

16  part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

17  **III.   DISCUSSION**

18          Defendant raises three arguments in its motion for partial summary judgment. *First*, that

19  the limitation of liability caps any damages Defendant may owe to $200,000. *See* Dkt. No. 127 at

20  13–16. *Second*, that Plaintiff may not succeed on its unjust enrichment claim because it admitted

21  that all of the costs Plaintiff seeks to recover flow from the Agreements. *See id.* at 16–19. *Lastly*,

22  that Plaintiff misrepresented its abilities when negotiating with Defendant, and the Court should

23  grant Defendant's fraud defense as to Plaintiff's breach of contract claim. *See id.* at 19–21. The

24  Court addresses each argument in turn.

25          **A.    Limitation of Liability**

26          Defendant first argues that the plain language of the limitation of liability provision in the

27  Agreements caps its total cumulative liability in this action to the "total amount paid to [Plaintiff]

28  for services performed under [the Agreements]." *See* Dkt. No. 89-1, Ex. 1 at ¶ 9.2. The only fact

5

1  necessary to enforce the cap, Defendant states, is the total amount that Defendant paid Plaintiff for

2  services performed.  And here, it is undisputed that Defendant paid Plaintiff a total of $200,000 for

3  services performed.  *See* Dkt. No. 43, Ex. A; Jaffe Decl. at ¶¶ 17–18; Kumpf Depo. at Ex. 4-A.

4  Thus, Defendant urges, under the plain language of the Agreements, "in no event" shall

5  Defendant's further liability to Plaintiff in this action exceed $200,000.  Plaintiff does not contest

6  the amount of money Defendant has paid to date for its services.  Instead, Plaintiff argues that the

7  limitation of liability is a boilerplate provision that conflicts with Plaintiff's right under the

8  termination provision in the Agreements to recover "its costs already incurred in the performance

9  of the Services."  *See* Dkt. No. 114 at 13–16 (citing  Dkt. No. 89-1, Ex. 1 at ¶ 11.1).  Plaintiff thus

10  concludes that the Court should disregard the limitation of liability provision entirely.  *See id.*

11        This dispute between the parties therefore concerns a pure question of law:  the meaning

12  and enforceability of the limitation of liability provision.  *See Welles v. Turner Entm't Co.*, 503

13  F.3d 728, 735 (9th Cir. 2007) (finding the interpretation of a contract is a question of law for the

14  Court to decide "unless the interpretation depends on the credibility of extrinsic evidence, in

15  which case the interpretation of the contract is the task of the factfinder").  According to the

16  Agreements, they "shall be governed by and construed in accordance with the laws of the State of

17  California."  *See* Dkt. No. 89-1, Ex. 1 at ¶ 12.1.  The Court therefore looks to California law.

18  When interpreting contracts, the overarching goal is to effectuate the parties' intent.  Cal. Civ.

19  Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the

20  parties as it existed at the time of contracting.").  The plain language governs.  Cal. Civ. Code

21  § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and

22  explicit."); *see also* Cal. Civ. Code § 1639 ("When a contract is reduced to writing, the intention

23  of the parties is to be ascertained from the writing alone, if possible.").  However, "[i]f the

24  terms . . . are in any respect ambiguous or uncertain, it must be interpreted in the sense in which

25  the promisor believed, at the time of making it, that the promisee understood it."  *See id.* at § 1649.

26  Therefore, when interpreting a contract, the Court must first determine whether its language is

27  ambiguous or reasonably susceptible to more than one interpretation.

28        Here, the Court finds that when read in its entirety, the language of the Agreements is

6

United States District Court
Northern District of California

1  unambiguous and the termination provision and limitation of liability are not in tension.

2  When read together, the termination provision permits Plaintiff to recover the costs it "incurred in

3  the performance of the Services," even if Defendant terminates the Agreements.  *See* Dkt. No. 89-

4  1, Ex. 1 at ¶ 11.1.  But under the limitation of liability provision, "in no event" shall any such costs

5  exceed the total amount Defendant paid to Plaintiff for services performed under the Agreements.

6  *See id.*, Ex. 1 at ¶ 9.2.  This limitation is also consistent with the overall payment structure under

7  the Agreements, in which Plaintiff is paid based on the volume of travel Defendant booked with

8  Plaintiff rather than Plaintiff's itemized costs.  *See id.*, Ex. 2, Ex. C ("Payment Terms" and "Flat

9  Management Fee").  In the event Defendant terminated the Agreements, as occurred here, Plaintiff

10  could thus recover its costs commensurate with the services it had provided.

11         To the extent Plaintiff suggests that there is something inherently problematic with

12  enforcing the limitation of liability provision in this case, the Court is not persuaded.  California

13  courts have generally enforced such clauses, noting that they are "intended to protect the

14  wrongdoer defendant from unlimited liability."  *See Food Safety Net Servs. v. Eco Safe Sys. USA,*

15  *Inc.*, 209 Cal. App. 4th 1118, 1126 (Cal. Ct. App. 2012) (quotation omitted).  Parties may limit

16  their liability in this way, and "[w]ith respect to claims for breach of contract, limitation of liability

17  clauses are enforceable unless they are unconscionable, that is, the improper result of unequal

18  bargaining power or contrary to public policy."  *Id.*  Plaintiff makes no effort to explain how the

19  limitation of liability provision in this case is unconscionable or contrary to public policy.  Indeed,

20  the Agreements indicate that "both parties . . . had sufficient time to have this Agreement reviewed

21  by counsel and that this Agreement will be deemed to have been jointly prepared by the [p]arties."

22  *See* Dkt. No. 89-1, Ex. 1 at ¶ 12.9.

23         That Plaintiff may be unable to recover substantial costs from Defendant does not render

24  the provision unenforceable.  Under similar circumstances, the California Court of Appeal

25  enforced a limitation of liability provision which precluded all recovery arising from an alleged

26  breach of contract.  *See Food Safety*, 209 Cal. App. 4th at 1127.  In *Food Safety*, Eco Safe had

27  asserted claims for breach of contract against Food Safety in connection with a study of Eco Safe's

28  food disinfection equipment.  *Id.* at 1122–23.  Eco Safe alleged that the study had not been

United States District Court
Northern District of California

1  conducted as specified.  *See id.* at 1124–25.  The trial court had granted summary judgment in

2  favor of Food Safety, holding that the parties' contract limited Eco Safe's possible recovery.  *Id.* at

3  1126–27.  The provision at issue stated:

4

5       [Food Safety's] total liability to you in connection with the work
        herein covered for any and all injuries, losses, expenses, demands,

6       claims or damages whatsoever arising out of or in any way related to
        the work herein covered, from any cause or causes, shall not exceed

7       an amount equal to *the lesser of* (a) damages suffered by you as the
        direct result thereof, or (b) the total amount paid by you to [Food

8       Safety] for the services herein covered.  We accept no legal
        responsibility for the purposes for which you use the test results.

9

10  *Id.* at 1126 (emphasis added).  The court noted the "broad and unqualified language" in this

11  provision, including that "'*[i]n no event*' is Food Safety liable for damages . . . 'arising out of or *in*

12  *any way related* to the work herein covered, *from any cause or causes*."  *Id.* at 1128 (emphasis

13  added).  In affirming summary judgment, the California Court of Appeal explained that "[b]ecause

14  it is undisputed that Eco Safe ha[d] paid nothing to Food Safety for the study, the clause thus

15  prohibit[ed] a recovery for breach of contract."  *Id.* at 1127.

16       The limitation of liability provision in this case is similarly clear:  "*in no event* shall Uber's

17  total cumulative liability . . . exceed the total amount paid to [Plaintiff] for services

18  performed . . . ."  *See* Dkt. No. 89-1, Ex. 1 at ¶ 9.2 (emphasis added).  Because Defendant only

19  paid $200,000 for Plaintiff's services under the Agreements, Plaintiff's recovery is so limited.  If

20  Plaintiff incurred costs under the Agreements that it cannot recoup because of the termination, that

21  was Plaintiff's hazard in entering into the Agreements with this limitation of liability provision.  It

22  is not for the Court to rewrite the parties' contract with the benefit of hindsight.  The Court

23  therefore finds that the limitation of liability provision caps Defendant's contractual damages at

24  $200,000.  Nevertheless, the Court agrees with Plaintiff that the limitation of liability provision

25  only applies to Plaintiff's breach of contract claim.  *See* Dkt. No. 145 at 15–16.  To the extent

26  Plaintiff seeks (and is entitled to) damages outside the contract, there simply is no basis for the

27  Court to find that the limitation of liability provision extends to such extracontractual damages.

28  //

8

### B. Unjust Enrichment

Defendant next argues that summary judgment is proper as to Plaintiff's claim for unjust enrichment/quantum meruit. *See* Dkt. No. 127 at 16–19. "Under California law, unjust enrichment can be the basis of a right to restitution or quasi-contractual recovery." *Shum v. Intel Corp.*, No. C-02 -03262-DLJ, 2008 WL 4414722, at *6 (N.D. Cal. Sept. 26, 2008) (citing *California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.*, 94 Cal. App. 4th 151, 172, 114, n.23 (Cal. Ct. App. 2001)). Similarly, quantum meruit is an "equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant." *In re De Laurentiis Entm't Grp. Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992). But such a quasi-contractual claim will not lie where there exists between the parties "a valid express contract governing the same subject matter." *Shvarts v. Budget Grp., Inc.*, 81 Cal. App. 4th 1153, 1159 (Cal. Ct. App. 2000). The California Court of Appeal has explained that "[t]he reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability and to withdraw from one party benefits for which he has bargained and to which he is entitled." *Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (Cal. Ct. App. 1975).

Here, Defendant contends that the Agreements cover the full scope of services for which Plaintiff seeks to recover in this action; Plaintiff's Rule 30(b)(6) witness conceded this; and thus Plaintiff may not seek to recover under any quasi-contractual cause of action. In its initial disclosures, Plaintiff identified five categories of damages:

(a) $791,580.25 in implementation costs to achieve the implementation criteria set forth in the Statement of Work;

(b) the separate implementation costs of Uber's specially requested company trip project in the amount of $101,450;

(c) the ongoing actual monthly cost of providing travel service to Uber, in the amount of $67,258.50 per month from January 2 through November 26,2015, or $739,843.50;

(d) the cost of the airline ticket purchased for Mr. Krometis in the amount of $1,226.30; [and]

United States District Court
Northern District of California

1

2

        (e)    any other out-of-pocket costs of travel advanced for Uber's
               benefit by TSI identified during discovery.

3    *See* Dkt. No. 129-6, Ex. F.  Items (a) through (c) track, in both description and dollar value, the

4    costs that Plaintiff invoiced Defendant for following termination.  *See* Kumpf Depo. at Ex. 4-A

5    through 4-G.[2]  Defendant asked Plaintiff's Rule 30(b)(6) deponent, Richard Kumpf, about these

6    costs (as detailed in "Exhibit 4").  Although Mr. Kumpf initially identified the costs generically as

7    related to "costs to perform services," without attribution to a specific SOW or contract, he

8    responded affirmatively when asked whether they were costs under the Agreements:

9

10               Q. What is this exhibit, exhibits 4-A through 4-G, what is it supposed
              to represent?

11               A. It is a statement of our costs to perform services.

12               Q. Was it – is it a statement of TSI's cost to perform services *under
              its contract and Statement of Work with Uber*?

13

14               A. *Yes*.

15    *See* Kumpf Depo. at 18:19–19:1 (emphasis added).  More granularly, Defendant asked whether the

16    $101,450 for the "specially requested company trip" ("Project Ginseng") was related to the SOW:

17

18               Q. Now if we could turn to Exhibit 4-C.  This is another invoice with
              a description of: Ginseng Project Costs per SOW November 24, 2014,
              April through July 2015, correct?

19

20               A. Correct

21               Q. So is it correct that the numbers reflected on this invoice, Exhibit
              4-C, totaling $101,450, are also costs that TSI claims to be due *under
              its contract with Uber because Uber terminated the agreement*?

22

23               A. *Yes*.

24    *See id.* at 49:14–24 (emphasis added).  Defendant urges that these admissions are binding and not

25    subject to further clarification.  *See* Dkt. No. 127 at 18.  Defendant also points out that the

26    Agreements expressly cover travel management services, and that all of Plaintiff's purported

27

28    [2] The Court understands that Plaintiff subsequently adjusted its calculations, reducing its claimed
   costs.  *See* Dkt. No. 129-1, Ex. 28.

United States District Court
Northern District of California

damages relate to travel management services.  *Id.* at 18–19.

In response, Plaintiff suggests that through clever questioning, Defendant led Mr. Kumpf to misstate the nature of Plaintiff's damages.  *See* Dkt. No. 145 at 6–7.  Plaintiff urges that it should not be bound by this mistaken concession.  By declaration in support of Plaintiff's opposition to the pending motion, Mr. Kumpf explains that "the underlying premise – that all of the work TSI performed for Uber was within the scope of the SOW – is factually inaccurate."  *See* Dkt. No. 146 at ¶ 4.  Mr. Kumpf additionally states that had he "otherwise understood that [defense counsel] was attempting to have me 'admit' that all of the itemized costs on TSI's invoice to Uber were for tasks within the SOW (which would be contrary to our consistent position from the inception of this litigation), I would have answered by making the distinction between work that was within, as opposed to outside, the scope of the SOW."  *See id.* at ¶ 7.  Plaintiff thus suggests that there is a fact question about the meaning of Mr. Kumpf's deposition testimony and whether the damages that Plaintiff seek to recover fall outside the scope of the Agreements.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quotation omitted).  "This sham affidavit rule prevents a party who has been examined at length on deposition from rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.* (quotation omitted) (alterations in original).  Nevertheless, "[t]he non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."  *Id.* (quotation omitted).

The Court understands Plaintiff to be arguing that Mr. Kumpf simply made a mistake in interpreting defense counsel's questions.  Yet the record does not support such an interpretation.  *First*, the disparity between Mr. Kumpf's given testimony and subsequent clarification is extreme.  During his deposition, Mr. Kumpf admitted that the damages Plaintiff seeks in this litigation are all related to the Agreements.  Yet now Mr. Kumpf states that some of Plaintiff's costs fall outside

the scope of the Agreements.  Were parties free to "correct" testimony in this fashion, depositions would be rendered meaningless and summary judgment easily averted.  *Second*, other than offering Mr. Kumpf's contradictory declaration, Plaintiff does not proffer any evidence establishing which of Plaintiff's costs are separate and apart from the Agreements.  Plaintiff does not cite any evidence about the nature of its costs at all.  In his declaration, Mr. Kumpf merely points to allegations in the SAC.  *See* Dkt. No. 145 at 3–4 (citing SAC at ¶¶ 17–22).  Mr. Kumpf does not rely on any independent knowledge about Plaintiff's work or the costs it incurred.  Nor does he parse through Exhibit 4 from his deposition to clarify which costs fall within and which costs fall outside the scope of the Agreements.  During the hearing on this motion, when the Court asked Plaintiff about these damages, Plaintiff demurred, stating that Defendant—not Plaintiff—bears the burden of establishing that it is entitled to summary judgment.  But a dispute of material fact is only "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Anderson*, 477 U.S. at 248.  The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient."  *Id.* at 252.  Thus, Plaintiff may not defeat summary judgment with allegations in the complaint.  *See* Fed. R. Civ. P 56(c)(1).  *Third*, the Court finds the timing of Mr. Kumpf's "correction" suspect.  Plaintiff did not clarify the meaning of Mr. Kumpf's testimony or otherwise correct it during the deposition itself. Nor did Plaintiff correct Mr. Kumpf's testimony after receiving the deposition transcript.  *See* Fed. R. Civ. P. 30(e).  Indeed, Plaintiff did not correct Mr. Kumpf's deposition testimony at any point in the six months between the deposition and Plaintiff's opposition to the motion for summary judgment.  The Court finds that the sham affidavit rule applies in this context, and the Court therefore strikes Mr. Kumpf's declaration to the extent he argues that his deposition testimony was mistaken and that Plaintiff seeks to recoup costs outside of the scope of the Agreements.  *See* Dkt. No. 146 at ¶¶ 2–13.

Aside from Mr. Kumpf's declaration, Plaintiff suggests that deposition testimony from Defendant's CEO, Howard Jaffe, creates a dispute of material fact regarding Plaintiff's quasi-contract claim, at least as to costs associated with Project Ginseng.  *See* Dkt. No. 145 at 9–12, 16. Mr. Jaffe acknowledged that Plaintiff was putting together a proposal for Project Ginseng and that

Project Ginseng was not mentioned by name in the SOW.  *See* Dkt. No. 147-1, Ex. F at 39:25–

43:1, 46:5–51:8, 72:23–73:3; Ex. G.  But despite Plaintiff's suggestion to the contrary, Mr. Jaffe

notably did not state that Project Ginseng fell outside the scope of the Agreements, and instead

said he believed the Agreements covered "meetings and events" such as Project Ginseng.  *See id.*

at 50:23–51:8.  Additionally, Plaintiff's own invoice stated that the "Ginseng Project Costs" were

"per" the SOW.  *See* Kumpf Depo. at Ex. 4-A, 4-E.  This is consistent with Mr. Kumpf's

deposition testimony in which he conceded that the $101,450 Plaintiff sought for "Ginseng Project

Costs" constituted "costs that [Plaintiff] claims to be due under its contract with Uber because

Uber terminated the agreement."  *See* Kumpf Depo. at 49:14–24.

Again, the Court understands Plaintiff's frustration that it may have incurred costs that it

cannot recoup under the Agreements.  Still, even drawing all reasonable inferences in the light

most favorable to Plaintiff, as it must, the Court finds that Plaintiff has not identified a dispute of

material fact sufficient to defeat summary judgment on its unjust enrichment/quantum meruit

claim.

## C.    Fraud Affirmative Defense

Lastly, Defendant contends that there is no dispute of material fact that Plaintiff

misrepresented its abilities to Defendant, so the Court should grant summary judgment as to its

affirmative defense for fraud to Plaintiff's breach of contract claim.  *See* Dkt. No. 127 at 19–21.

"It is well established that a defrauded defendant may set up the fraud as a defense and, in fact,

may even recoup his damages by counterclaim in an action brought by the guilty party to the

contract."  *Bowmer v. H. C. Louis, Inc.*, 243 Cal. App. 2d 501, 503 (Cal. Ct. App. 1966).  In

California, the elements of fraud are:  (1) misrepresentation; (2) knowledge of falsity; (3) intent to

defraud or to induce reliance (4) justifiable reliance; and (5) resulting damage.  *See Odorizzi v.*

*Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 129 (Cal. Ct. App. 1966).

Here, Defendant argues that Plaintiff made several false or misleading statements in its

project proposal to induce Defendant to enter into the Agreements with Plaintiff, including that

Plaintiff had over 3,000 employees; operated in over 250 cities; had "wholly owned visa and

passport offices" in various regional offices; and had earned over $200 million in revenue in the

United States District Court
Northern District of California

1    United States in 2013.  *See, e.g.*, Dkt. No. 127 at 6–7 (citing Dkt. No. 128-1, Ex. 1 at

2    UBER0014041, UBER0014058, UBER0014097).  In reality, Defendant states, Plaintiff had only

3    approximately 100 employees; had offices in just five U.S. cities; had only one employee who

4    processed passports and visas; and had only earned between $15 and $17 million in revenue.  *Id.*

5    (citing Kumpf Depo. at 12:11–13:4, 16:10–20, 18:1–11, 34:16–35:17).  Defendant concludes that

6    had it known the truth, it would not have contracted with Plaintiff.  *See* Dkt. No. 127 at 7, 20–21.

7          Plaintiff, in turn, responds that it did not misrepresent itself and that, in any event,

8    Defendant was aware of Plaintiff's size and the nature of its global operations.  *See* Dkt. No. 145

9    at 3–6, 16–17.  For example, Plaintiff points to a PowerPoint presentation created by Defendant's

10   in-house travel manager, Margaret Brady, which notes that Plaintiff is "Small in Size" and that

11   Uber would be its "largest client."  *See* Dkt. No. 147-1, Ex. E at UBER000123.  The presentation

12   also noted that Plaintiff is "a global company operating thru [*sic*] consortia network," in contrast

13   to Plaintiff's competitor which had the "largest employee base and broadest footprint covering the

14   most countries."  *Id.* at UBER000124.  During her deposition, Ms. Brady explained that she

15   understood that "operating through consortia network" meant that Plaintiff's "service

16   configuration globally was more of a profile of a network than wholly-owned offices."  *See id.*,

17   Ex. D. at 19:17–20:14.  She clarified that this could mean it operated through "clustered agencies,"

18   but that the agencies may not be wholly owned by Plaintiff.  *Id.* at 20:3–14, 33:1–23.  Mr. Kumpf

19   further explained Plaintiff's representations about its size, global footprint, and revenue referred to

20   both employees and this "consortia" of other agencies.  *See* Dkt. No. 147-1, Ex. A at 29:12–33:25.

21   Mr. Kumpf also explained that he attended a meeting with Ms. Brady and Mr. Jaffe in which

22   Plaintiff explained its relationship with these other affiliated entities.  *See* Dkt. No. 146 at ¶ 20.

23         Defendant suggests that Plaintiff's testimony does not directly address the specific

24   misstatements that Defendant identified, and instead raises separate, undisputed facts about

25   Plaintiff's affiliates.  *See* Dkt. No. 148 at 9–10.  But Defendant misapprehends Plaintiff's

26   argument.  Plaintiff argues that its statements about the nature and scale of its operations—such as

27   the number of employees, cities of operation, and revenue—included figures from these affiliate

28   entities, and that Defendant knew this.  Of course, Defendant may nevertheless argue that these

United States District Court
Northern District of California

1   statements are still misleading, and disagree as to what Defendant knew about Plaintiff's

2   operations, but those are issues for the factfinder to determine at trial.  The Court finds that

3   Plaintiff has thus established material disputes of fact as to whether Plaintiff fraudulently

4   misrepresented its size, revenue, and structure in its pre-contractual communications with

5   Defendant, so as to preclude summary judgment as to Defendant's affirmative defense.

6   **IV.    CONCLUSION**

7        Accordingly, the Court **GRANTS** Defendant's motion for partial summary judgment to

8   the extent Plaintiff seeks to obtain contractual damages that exceed $200,000.  The Court further

9   **GRANTS** Defendant's motion for partial summary judgment as to Plaintiff's claim for unjust

10  enrichment/quantum meruit.  The Court otherwise **DENIES** the motion in its entirety.  The Court

11  further **SETS** a telephonic case management conference for September 22, 2020, at 2:00 p.m. to

12  discuss how to resolve the remaining breach of contract claim efficiently.  All counsel, members

13  of the public and press may use the following dial-in information below to access the conference

14  line:

15       **Dial In:**  888-808-6929

16       **Access Code:**  6064255

17  The amended scheduling order otherwise remains in effect.  *See* Dkt. No. 123.

18       **IT IS SO ORDERED.**

19  Dated:  9/3/2020

20

21  HAYWOOD S. GILLIAM, JR.
    United States District Judge